IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 31, 2021

**STATE OF TENNESSEE v. ERIC MANZENBERGER**

**Appeal from the Circuit Court for Sevier County
No. 24069-II James L. Gass, Judge**

_____

**No. E2020-00218-CCA-R3-CD**

_____

A jury convicted the Defendant of driving under the influence of an intoxicant, driving in excess of the speed limit, and violating the light law, and he received an effective sentence of eleven months and twenty-nine days, with the sentence to be suspended after fourteen days in confinement. On appeal, the Defendant asserts that the trial court erred in denying his motion to suppress certain statements made to law enforcement. After a review of the record, we conclude that the Defendant was not in custody under *Miranda v. Arizona*, 384 U.S. 436 (1966), and we affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

John C. Barnes, Knoxville, Tennessee, for the appellant, Eric Manzenberger.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and Brad Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant was stopped by law enforcement for speeding and having a malfunctioning brake light, and he was ultimately charged with driving under the influence of an intoxicant ("DUI") in addition to the speeding and light law violations. *See* T.C.A. §§ 55-10-401; 55-8-152; 55-9-402. The Defendant moved to suppress several

of the statements he made to law enforcement on the basis that he was subjected to custodial interrogation without being informed of his right to remain silent.

The parties stipulated at the hearing on the motion to suppress that the facts surrounding the arrest as summarized in the Defendant's motion to suppress were accurate. The motion summarized the arrest by stating that the vehicle was stopped for speeding and a violation of the brake light law and that the arresting officer, Sergeant Nathan Hatfield of the City of Gatlinburg Police Department, immediately asked the Defendant how much he had had to drink, to which the Defendant responded that he had consumed two Miller Lite draft beers. Sergeant Hatfield then asked the Defendant to perform some field sobriety tests. According to the motion, the following exchange[1] took place:

> D: Just out of curiosity, what happens if I decline, sir?
> H: If you decline to take the test?
> D: Yes, sir.
> H: You'll be placed under arrest.

The Defendant argued that he was essentially in custody from the point at which Sergeant Hatfield declared that the Defendant would be arrested if he did not perform the tests. He further argued that the following interaction, which took place at the conclusion of the field sobriety tests, constituted custodial interrogation:

> H: Couple more questions, how much beer or how much alcohol did you have to drink?
> D: I told you before – I had three drinks earlier.
> H: What kind were they?
> D: I had three beers earlier.
> H: What kind of beers?
> D: Miller Lite, sir, three of them, twelve ounces.
> H: Because in the car when I asked you, you stated that you had two, sixteen ounces. Which one is it? Two or three? …. Are you not sure?
> D: Two one-thousand, sir…. Two.
> H: You just said two one-thousand?
> D: I did, sir. I'm not going to lie to you. I did.
> H: What did you mean two one-thousand?
> D: It was an incorrect statement, sir. I don't want to lie to you.

---

[1] For clarity, we have made minor alterations in the typography and punctuation of the interactions as summarized in the motion, but we have not altered the words spoken by Sergeant Hatfield or the Defendant as quoted in the Defendant's motion.

H: Do you think that the alcohol in your system right now has caused you to drive poorly?

D: Can I be honest with you, sir? That is a question I really don't want to answer at the moment.

H: Do you think that you are too intoxicated to drive?

D: At the moment, honestly, no, sir.

H: Do you feel buzzed or anything?

D: I do slightly, sir, just want to be honest with you.

H: On a scale of zero to ten, zero being completely sober and ten being really, really drunk, how do you feel right now?

D: Three.

The Defendant requested the suppression of all the statements he made after Sergeant Hatfield informed him that if he did not perform the field sobriety tests, he would be arrested. The trial court denied the motion, concluding that Sergeant Hatfield was conducting an investigatory stop and that Sergeant Hatfield's statement did not transform the encounter into a custodial arrest.

At trial, Sergeant Hatfield testified that at around 1:00 a.m. on March 2, 2017, he observed the Defendant's vehicle driving thirty-seven miles per hour on the highway in downtown Gatlinburg, where the speed limit was twenty-five miles per hour. Sergeant Hatfield further observed that one of the Defendant's brake lights was not operating. Sergeant Hatfield activated his blue lights and stopped the Defendant. The Defendant responded appropriately by stopping in a trolley loading zone.

Sergeant Hatfield testified that he could smell alcohol on the Defendant when he approached the vehicle and that the Defendant's eyes were bloodshot and glassy. He asked the Defendant how much he had had to drink. Sergeant Hatfield testified that he had difficulty understanding what the Defendant said, and that the Defendant's speech indicated impairment.

The body camera video of the arrest was played for the jury, and the salient exchanges substantially matched the transcript contained in the Defendant's motion to suppress. Sergeant Hatfield informed the Defendant he was being stopped for speeding and a broken tail light, and he asked for and took possession of the Defendant's driver's license. The Defendant gave Sergeant Hatfield the address of the cabin where he was staying and told Sergeant Hatfield he had consumed two sixteen-ounce Miller Lite beers approximately two hours before being stopped. A passenger in the vehicle also acknowledged having consumed alcohol. The Defendant was asked to exit the car, move to the sidewalk, and perform field sobriety tests. The Defendant asked Sergeant Hatfield,

"Just out of curiosity, what happens if I decline, sir?" Sergeant Hatfield responded, "If you decline to take the test? You'll be placed under arrest."

Sergeant Hatfield asked the Defendant to do the walk-and-turn test. Sergeant Hatfield testified that the Defendant failed to follow the instruction about maintaining his position while he listened to Sergeant Hatfield complete the instructions. According to Sergeant Hatfield, the Defendant made an improper turn, stopped to steady himself, and asked for instructions to be repeated although remembering the instructions was part of the divided attention test. Sergeant Hatfield stated that two "clues" on the test may indicate impairment and that he observed three "clues" with the Defendant's performance. The Defendant also performed the one-leg stand test, during which he was asked to hold up his leg while counting "one one-thousand, two one-thousand," etc. Sergeant Hatfield testified the Defendant put his foot down three times, used his arms for balance, and swayed. Sergeant Hatfield stated that two "clues" would indicate impairment on this test and that he observed three "clues" during the Defendant's performance.

At the conclusion of the tests, Sergeant Hatfield again asked the Defendant regarding his consumption of alcohol, and the Defendant made the statements challenged in the motion to suppress, including that he felt "buzzed" and had consumed "two one-thousand" beers. Sergeant Hatfield arrested the Defendant. Prior to reading him his rights, Sergeant Hatfield asked the Defendant about the ownership of the car and stated that, because the Defendant's passenger had acknowledged drinking, law enforcement would have to "come up with something to do." The Defendant responded, "Is there any way that we can have someone sober come pick us up?"

Sergeant Hatfield testified that the Defendant subsequently refused to submit to a breathalyzer test after having been given the implied consent form. The Defendant felt nauseated during the ride to the police department, and he vomited multiple times during the booking process. The vomit smelled of alcohol.

On cross-examination, Sergeant Hatfield agreed that he stopped the Defendant for speeding and a brake light violation and that neither of those things are indicative of impaired driving. He testified that the Defendant reacted to the activation of the emergency lights in a "fair, normal manner" and that the Defendant's manner of stopping his vehicle did not indicate impairment. He agreed that being pulled over was a "real world divided attention test" and that the Defendant performed appropriately. He agreed that the Defendant was polite and knew the address of the cabin where he was staying.

Sergeant Hatfield testified that the smell of alcohol associated with the Defendant was "moderate" and consistent with drinking two beers. He agreed that the Defendant

did not make mistakes on walking heel-to-toe or stepping off the line on the walk-and-turn test, even though he had eighteen opportunities to make a mistake. He agreed that performance on the field sobriety tests could be affected by age, weight, or medical issues and that poor performance did not necessarily indicate intoxication. He acknowledged that the Defendant attributed his nausea to altitude sickness and that the Defendant was visiting Gatlinburg from a city which was near sea level. He also agreed nausea could be a symptom of anxiety.

The jury convicted the Defendant as charged, and the Defendant was sentenced to eleven months and twenty-nine days for the DUI, with fourteen days served in jail and the remainder on probation. He was sentenced to thirty days of unsupervised probation for speeding and for the light violation, and he was assessed fines for the convictions. The Defendant moved for a new trial, asserting in part that the trial court had erred in the suppression decision. The trial court denied the motion, and the Defendant appeals.

## ANALYSIS

The Defendant asserts that the trial court erred in admitting the statements he made to Sergeant Hatfield after he was told that a failure to perform the field sobriety tests would result in his arrest. The State responds that the Defendant was not in custody for the purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that any error was harmless in light of the evidence at trial. We conclude that, under the totality of the circumstances, the Defendant was not in custody and that the trial court, accordingly, did not err in admitting the statements.

A trial court's findings of fact in a suppression hearing are binding on the appellate court unless the evidence preponderates against them. *State v. Clark*, 452 S.W.3d 268, 282 (Tenn. 2014). Questions regarding the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party who prevails at the trial level is entitled to the strongest legitimate view of the evidence and to reasonable and legitimate inferences which may be drawn from it. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Questions of law and mixed questions of law and fact are reviewed de novo with no presumption of correctness. *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008). An appellate court may consider evidence adduced at trial in determining the correctness of a ruling on a motion to suppress. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). When the trial court's factual findings do not depend on the court's evaluation of witness credibility but on evidence which may be reviewed in its entirety on appeal, such as a videotapes or transcripts, those factual findings are reviewed de novo. *Id.*; *State v. Dailey*, 273 S.W.3d 94, 100 (Tenn. 2009).

Both the United States Constitution and Tennessee Constitution protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. Accordingly, law enforcement are required to inform a suspect who is questioned in police custody that: "(a) he has the right to remain silent; (b) any statement made may be used against him; (c) he has the right to the presence of an attorney; and (d) if he cannot afford an attorney, one will be appointed for him prior to questioning, if he so desires." *State v. Anderson*, 937 S.W.2d 851, 853 (Tenn. 1996) (citing *Miranda*, 384 U.S. at 444). Furthermore, "'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001) (quoting *Miranda*, 384 U.S. at 444).

*Miranda* warnings are required only when a suspect is subjected questioning or its functional equivalent while in custody. *Walton*, 41 S.W.3d at 82. Custodial interrogation is "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Anderson*, 937 S.W.2d at 853 (quoting *Miranda*, 384 U.S. at 444). Here, the parties do not dispute that Sergeant Hatfield's questions constituted interrogation. The custody analysis requires determining "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *Anderson*, 937 S.W.2d at 855. Relevant factors include:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* However, the factors are not exclusive, and the ultimate inquiry evaluates the totality of the circumstances in light of those factors which are relevant. *Id.*

It is undeniable that a routine traffic stop "significantly curtails the 'freedom of action' of the driver and passengers." *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984).

The driver is certainly not free to leave or disobey a directive to pull over, and such a stop constitutes a seizure. *Id.* at 436-37; *see Maryland v. Shatzer*, 559 U.S. 98, 112-13 (2010) (noting that freedom of movement is not accorded talismanic power in the custody analysis because the application of *Miranda* should be governed by the concerns regarding coercion which underlie the decision). Nevertheless, in *Berkemer*, the United States Supreme Court held that persons temporarily detained pursuant to routine traffic stops are not "in custody" for the purposes of *Miranda*. *Berkemer*, 468 U.S. at 440; *see State v. Michael Hugo Brooks*, No. W2009-00274-CCA-R3-CD, 2010 WL 481212, at *2 (Tenn. Crim. App. Feb. 11, 2010) (noting that a person is not 'in custody' for the purposes of *Miranda* when the person is temporarily detained for a traffic stop, "including one involving intoxication"). The *Berkemer* court noted that two features of such stops militate against the underlying concerns which *Miranda* was intended to allay:

> First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.

> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated"

than that surrounding the kinds of interrogation at issue in *Miranda* itself,
… and in the subsequent cases in which we have applied *Miranda*.

*Berkemer*, 468 U.S. at 437-39 (footnotes and citations omitted). The *Berkemer* court instead likened an ordinary traffic stop to a *Terry* stop in its brevity and "nonthreatening" nature. *Id.* at 439-40 & n.29 (noting that a traffic stop supported by probable cause may exceed the scope of a *Terry* stop) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The Court went on to caution that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440.

Because the only relevant concern to the custody determination of a person seized pursuant to a traffic stop is a reasonable person's understanding of his or her freedom of movement, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Id.* at 442. A police officer's belief regarding whether or not the suspect is in custody is one among many factors to consider, "'but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.'" *Anderson*, 937 S.W.2d at 854 (emphasis omitted) (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). In *Berkemer*, the Court noted that although the officer had determined he would arrest the defendant, this intention was not communicated to the defendant, and accordingly did not have any impact on the custody analysis. *Berkemer*, 468 U.S. at 442. The analysis in *Berkemer* specifically cited to the fact that "[a]t no point during that interval was respondent informed that his detention would not be temporary." *Berkemer*, 468 U.S. at 441-42.

The Defendant's argument that he was in custody in this case turns on Sergeant Hatfield's telling the Defendant that, if the Defendant refused to perform the field sobriety tests, Sergeant Hatfield would place him under arrest.[2] He asserts that this statement transformed the interaction into a custodial interrogation. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury*, 511 U.S. at 325; *see United States*

---

[2] Although the Defendant asserts that the trial court applied Fourth Amendment jurisprudence and that this case "involves a choice between two constitutional doctrines which under the particular facts of the Appellant's case are in conflict," we observe that the question of whether Sergeant Hatfield had reasonable suspicion to detain or probable cause to arrest the Defendant is separate from the question of whether the Defendant was in custody for the purposes of *Miranda* when Sergeant Hatfield questioned him. *See United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998). The issue raised on appeal is whether the Defendant was in custody, that is, whether a reasonable person would consider himself deprived of freedom of movement to a degree associated with a formal arrest such that Sergeant Hatfield should have informed him of his *Miranda* rights. We accordingly limit our analysis to this issue.

*v. Moore*, 104 F.3d 377, 389 n.5 (D.C. Cir. 1997) ("[T]he *Berkemer* Court ... recognized that the distinction between a 'traffic stop' and being 'in custody' rested not only upon the fact that the stop would be 'presumptively temporary and brief,' but equally upon the motorist's expectations 'that in the end he most likely will be allowed to continue on his way.'" (Quoting *Berkemer*, 468 U.S. at 437)). Threats of arrest are pertinent to the determination of whether a suspect is in custody. *See United States v. Panak*, 552 F.3d 462, 467-68 (6th Cir. 2009) (noting that "[h]ad this interview occurred in a less congenial location, had the officers by word or action asserted their arrest authority or had they threatened Panak by emphasizing their knowledge of her guilt," their failure to inform the defendant that she was free to leave may have "made all the difference"). Accordingly, "numerous courts have indicated that whether law enforcement officers threatened arrest or other penalties to induce cooperation is an important element to assess in evaluating whether a defendant was in custody." *United States v. Blakey*, 294 F. Supp. 3d 487, 494 (E.D. Va. 2018) (citing cases).

Certainly, courts have concluded that the absence of such a threat weighs against a finding of custody. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (noting that, when the defendant's parents brought him to the police station for an interview, one factor weighing against custody was that law enforcement did not threaten the defendant with arrest or suggest he would be arrested); *State v. Timothy A. Summers*, No. E2007-02127-CCA-R3-CD, 2008 WL 4613664, at *4 (Tenn. Crim. App. Oct. 13, 2008) (the defendant was not made aware that the officer did not intend to let him leave based on the fact that the defendant was driving and smelled of alcohol); *State v. Andrew Lay*, No. M1998-00257-CCA-R3-CD, 2000 WL 329948, at *3-4 (Tenn. Crim. App. Mar. 30, 2000) (noting that the defendant was not in custody at the time he made incriminating statements during a traffic stop in part because "the appellant was detained for a short period of time prior to his arrest, and the officer never informed the appellant that he was not free to leave").

On the other hand, a threatened arrest is a factor that weighs in favor of a determination that the suspect was in custody under *Miranda*. *See United States v. Leong*, No. 96-4876, 116 F.3d 1474, at *1, *4 (4th Cir. 1997) (the defendant was in custody when the officer told the occupants of the vehicle that "they were 'all going to be placed under arrest' until he could determine who owned the firearm"); *Blakey*, 294 F. Supp. 3d at 496 (concluding that the defendant, who voluntarily entered a police vehicle and was driven around while he was interviewed, was in custody when he was repeatedly threatened with arrest if he did not cooperate by revealing information about drug trafficking); *Sevier v. Turner*, 742 F.2d 262, 267–68 (6th Cir. 1984) (noting that if the factual allegations were true, the defendant was in custody when the circumstances included a letter sent to the defendant, who was delinquent in child support, that he would

be arrested if he did not appear in court and a threat of arrest if he did not sign a consent order).

Others courts have found that, in light of the totality of the circumstances, a threat of arrest was not dispositive of the issue and that the defendant was not in custody. *State v. James*, 225 P.3d 1169, 1173 (Idaho 2010) (concluding that "the threat of lawful arrest alone does not transform non-custodial questioning into the functional equivalent of arrest" when the officer threatened to arrest all the occupants of the car if none admitted possession of the drugs); *People v. Linda Sue Lumbreras*, No. 311971, 2013 WL 3766589, at *3 (Mich. Ct. App. July 18, 2013) (concluding that the defendant was not in custody when she was asked to reenter a patrol vehicle after being informed she could possibly be arrested if she did not cooperate).

The ultimate inquiry remains whether a reasonable person in the Defendant's position would consider himself "deprived of freedom of movement to a degree associated with a formal arrest." *Anderson*, 937 S.W.2d at 855. In other words, a reasonable person's understanding of the nature and expected length of the detention bears on the custody determination. *See United States v. Leevern Johnson*, No. CR05-4063-MWB, 2005 WL 2704892, at *11 (N.D. Iowa Oct. 20, 2005) (concluding that the defendant was not in custody when the officer informed him only that he would be detained until a booking photograph became available for comparison because the circumstance would not cause "a reasonable person to believe that the detention was not temporary and that he would not soon be free to leave."); *People v. Null*, 233 P.3d 670, 677 (Colo. 2010) (the defendant was in custody after a traffic stop when he attempted to leave and was stopped, when he failed field sobriety and breathalyzer tests, and when the circumstances established "objective reasons to believe that he was under arrest and would not be briefly detained and then released").

In the case at bar, the Defendant was stopped for speeding and a brake light violation in downtown Gatlinburg. Sergeant Hatfield was alone when he stopped the Defendant, and although another officer later arrived on the scene, the only police officer with whom the Defendant interacted was Sergeant Hatfield. The interaction between the Defendant and Sergeant Hatfield was cordial throughout, and the stop lasted approximately fourteen minutes prior to the Defendant's arrest. The scene remained public, with the Defendant being asked to perform field sobriety tests on the sidewalk of a well-lit trolley stop. The Defendant was made aware that Sergeant Hatfield had stopped him for speeding and for the brake light violation and that Sergeant Hatfield then suspected he might be intoxicated. The Defendant asked Sergeant Hatfield what would happen if he refused to take the field sobriety tests and Sergeant Hatfield responded that the Defendant would be arrested if he refused. Sergeant Hatfield's response in this case was conditioned on his hypothetical inability to further his investigation. Sergeant

Hatfield did not tell the Defendant that he had already determined that the Defendant would definitely be arrested as a result of the traffic stop, and he did not raise the specter of arrest as a tool to coerce the Defendant into making a statement. Instead, he was responding to the Defendant's hypothetical question regarding what action he would take if the Defendant did not cooperate with further investigation. We conclude that a reasonable person in the Defendant's situation would conclude that Sergeant Hatfield's determination regarding whether to arrest the Defendant was being delayed until Sergeant Hatfield had furthered his investigation. *See Abrahamson v. State*, 623 S.E.2d 764, 767 (Ga. Ct. App. 2005) (when the defendant was asked to remain in her vehicle until a DUI officer arrived, "a reasonable person could conclude that her freedom of action was only temporarily curtailed and that a final determination of her status was simply delayed"). Accordingly, while the Defendant certainly remained under a temporary detention, we do not think he was "deprived of freedom of movement to a degree associated with a formal arrest" as a result of Sergeant Hatfield's statement alone. *Anderson*, 937 S.W.2d at 855. While Sergeant Hatfield retained possession of the Defendant's driver's license, *see State v. Daniel*, 12 S.W.3d 420, 427 (Tenn. 2000), such an action is typical of a temporary roadside seizure and does not necessarily implicate *Miranda*. Although Sergeant Hatfield's response weighs in favor of a finding of custody, the bulk of the factors listed in *Anderson* ultimately weigh against a finding of custody. We note that this court has previously determined that an inability to pass a field sobriety test does not convert a traffic stop into a custodial detention for *Miranda* purposes. *State v. Amber Lee Stidham*, No. M2007-01757-CCA-R3-CD, 2008 WL 5397900, at *5 (Tenn. Crim. App. Dec. 30, 2008) (rejecting the defendant's contention that she was in custody after failing field sobriety tests). We accordingly conclude that the trial court did not err in admitting the statements.

## CONCLUSION

Based on the foregoing analysis, we affirm the trial court's judgments.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE